**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-3421-WJM-STV

DANIEL R. GOODWIN,

      Plaintiff-Counter Defendant,

v.

CAROL SMITH-CHAMBERS,

      Defendant-Counter Claimant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ENTERED UPON TRIAL ON THE MERITS TO THE COURT**

---

      Plaintiff-Counter Defendant Daniel Goodwin ("Plaintiff"), proceeding *pro se*, brings this breach of contract action against Defendant-Counter Claimant Carol Smith-Chambers ("Defendant"), alleging that Defendant breached the Loan and Vehicle Transfer Agreement ("Loan Agreement") by selling several of his vehicles, which he alleges were worth at least $545,500.  (ECF No. 1 at 7.)  Defendant brings counterclaims for breach of contract and unjust enrichment, alleging that Plaintiff failed to repay her loan of over $70,000.  (ECF No. 3 at 2.)

      On August 28, 2023, the case proceeded to a two-day bench trial before the undersigned.  (ECF Nos. 162, 163.)   After the trial, the parties submitted proposed findings of fact and conclusions of law.  (ECF Nos. 175, 188.)  As relief, Plaintiff requests "relief for mental and emotional distress and compensatory damage[s] in the amount of $545,500."  (ECF No. 1 at 9.)  Defendant requests judgment against Plaintiff for an amount to be proven at trial, with interest.  (ECF No. 3 at 2.)

Having considered the arguments and evidence submitted, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a) and 65(d).

## TABLE OF CONTENTS

**I. FINDINGS OF FACT** ..................................................................................................... **5**

    A.   Parties ............................................................................................................ 5

    B.   June 15, 2016 Visit ...................................................................................... 5

        1.   Visitation Records ............................................................................. 5

        2.   Documents ......................................................................................... 6

    C.   July 6, 2016 Visit ........................................................................................ 9

    D.   Defendant's Loans and Expenses ......................................................... 10

    E.   Defendant Requests Repayment from Plaintiff.................................. 11

    F.   Sale of Vehicles ......................................................................................... 12

**II. CONCLUSIONS OF LAW** ....................................................................................... **13**

    A.   Jurisdiction & Status of the Parties .................................................... 13

    B.   Applicable Law ......................................................................................... 13

        1.   Parties' Claims ................................................................................. 13

        2.   Choice of Law Analysis .................................................................. 14

        3.   Breach of Contract .......................................................................... 16

        4.   Unjust Enrichment.......................................................................... 17

        5.   Plaintiff's Other Theories ............................................................. 19

        6.   Colorado Attorney Fees Statute for Frivolous Actions ...................... 20

    C.   Plaintiff's Breach of Contract Claim .................................................... 21

D.   Defendant's Counterclaims ...................................................................... 22

    1.   Liability ................................................................................................. 22

    2.   Damages ............................................................................................... 24

    3.   Attorney's Fees and Costs .............................................................. 31

**III. Rule 52(C) MOTIONS .......................................................................... 32**

**IV. CONCLUSION ......................................................................................... 33**

# I. FINDINGS OF FACT

## A.   Parties

1.      Plaintiff was an International Brotherhood of Electrical Workers journeyman lineman.  (Tr. 9:4.)[1]

2.      Plaintiff and Defendant met in 2009 when Defendant's acquaintance recommended that Plaintiff help her do some things around her home and property. (Tr. 104:24–105:6.)

3.      Following a criminal conviction, Plaintiff was incarcerated by the Pueblo County Sheriff's Office on June 3, 2016.  (Ex. 2.)

4.      Defendant introduced attorney Elizabeth McClintock to Plaintiff after he asked Defendant to find him a female appellate attorney.  (Tr. 141:21–142:1.)  Plaintiff hired McClintock as his appellate attorney.  (Tr. 25:16–22, 26:7–13.)

## B.   June 15, 2016 Visit

1.      Visitation Records

5.      On June 15, 2016, McClintock visited Plaintiff at the Pueblo County Detention Facility ("PCDF") and brought several documents with her for Plaintiff to sign. (Tr. 26:17–24, 54:20–55:11.)

6.      Plaintiff denies that any visitation occurred on June 15, 2016, and as a result, contends that he could not have signed four State of Colorado Powers of

---

[1] Citations to "Tr." refer to the trial transcript, docketed in two  parts.  (*See* ECF No. 169 (August 28, 2023, Vol. 1, pp. 1–174); ECF No. 170 (August 30, 2022, Vol. 2, pp. 176–254).)  At various stages of this bench trial, particularly because Plaintiff proceeded *pro se*, the Court found it necessary to engage in spontaneous colloquies with the parties, witnesses, and lawyers.  Therefore, for the purposes of these Findings of Fact and Conclusions of Law, the Court cites the entire transcript to make its factual and legal findings, including the opening statements and the Court's colloquies with the parties.

Attorney for Motor Vehicles Only ("MV POA"), discussed more below.  (Tr. 10:15–17; 23:22–25.)

7.      In response to Plaintiff's March 10, 2021 Colorado Open Records Act Request, PCDF issued an Explanation for Denial of Inspection stating in relevant part that "PCDF has no records of visitation records for any party during the time period of June 2016 to July 2016."  (Ex. 1; Tr. 54:20–55:11, 230:14–231:1.)

8.      The Loan Agreement, signed by Plaintiff and Defendant, is dated June 15, 2016.  (Ex. 34.)

9.      Given that the record shows that PCDF did not keep records of visitation—one way or another—during the pertinent time period, including June 15, 2016, and that the Loan Agreement is dated June 15, 2016, and Plaintiff does not dispute signing it, the Court finds that McClintock visited Plaintiff on June 15, 2016.

2.      <u>Documents</u>

        a.      *Motor Vehicle Power of Attorney*

10.     McClintock brought several documents to PCDF for Plaintiff to sign and have notarized, including a will; four MV POAs; and the Loan Agreement.  (Ex. A18 (will); Ex. 14 (1998 Monaco); Ex. 17 (1969 Chevrolet Corvette); Ex. 21 (1990 Ford Bronco); Ex. 25 (1985 E-Z boat); Ex. 34 (Loan Agreement).)

11.     Plaintiff signed the will several months later on November 8, 2016.  (Ex. A18.)  In the will, Plaintiff wrote: "To Carol Smith/Chambers ALL legal expenses[,] travel expenses[,] and all phone & canteen mon[e]y loaned to me to be paid from (NEAP[2]).

---

[2] "NEAP" refers to the National Electrical Annuity Plan account belonging to Plaintiff.  (Tr. 93:10; Ex. 45.)

Make sure Carol Smith/Chambers is paid in full." (*Id.*)

12.     The MV POAs state: "The purpose of this Power of Attorney is to give the person you designate (your agent) powers to handle your property and affairs, which may include power to pledge, sell, or otherwise dispose of the motor vehicle described below without any advance notice to you." (Exs. 14, 17, 21, 25.) Further, the blanks Plaintiff checked off on the MV POAs allow Defendant, among other things, to "Apply for and Receive Certificate of Title" and "To transfer ownership and acknowledge odometer reading." (Exs. 14, 17, 21, 25.)

13.     The four aforementioned MV POAs were signed "Daniel Roger Goodwin." (Exs. 14, 17, 21, 25.)

14.     According to Plaintiff, his habit is to sign documents "Daniel R. Goodwin," not "Daniel Roger Goodwin," and thus he denies signing these four MV POAs. (Tr. 10:22–11:3, 97:4–14.)

15.     However, Plaintiff also admits that he "was going to transfer those vehicles anyway." (Tr. 97:15–19.)

16.     Despite Plaintiff's testimony that he did not sign the MV POAs for the Monaco, Corvette, Bronco, and boat, relying on the testimony and opinions of Defendant's handwriting expert, Curtis Baggett, the Court finds that Plaintiff signed the four MV POAs on June 15, 2016. Based on his expert analysis of Plaintiff's handwriting and signature, Mr. Baggett concluded that contrary to Plaintiff's testimony, Plaintiff does not have a habit of signing his name "Daniel R. Goodwin." (Tr. 208:1–209:10, 214:1–11; Ex. B (Baggett's expert report).) Mr. Baggett further concluded that the same person wrote all of the signatures on all of the documents he was asked to examine,

including the four MV POAs bearing the signature "Daniel Roger Goodwin."  (Tr. 170:16–22, 206:22–208:6.)

17.     Further, Plaintiff acknowledged the lack of evidence supporting his protestations of forgery, testifying that that other than the absence of a record of visitation for June 15, 2016, he has no evidence that he did not sign the four MV POAs. (Tr. 238:17–239:7.)

18.     Plaintiff also does not dispute signing the Loan Agreement, also dated June 15, 2016, undermining his assertion that he did not sign the four MV POAs that same day.

b.     *Loan and Vehicle Transfer Agreement*

19.     Pursuant to the Loan Agreement, dated June 15, 2016, Plaintiff obtained a $35,000 loan from Defendant to pay McClintock.  (Tr. 26:7–15; Ex. 34.)  The Loan Agreement, signed by both parties, states in full:

> On this 15 day of June 2016, I[,] Daniel R. Goodwin[,] will transfer ownership of my vehicles to Carol R. Smith-Chambers for the purpose of securing a loan in the amount of $35,000.  The loan is to be used specifically for my legal defense and expenses.  The loan may be repaid at anytime [*sic*] without penalty but shall be redeemed within 3 months from the date I attain age 59 ½ or at the earliest possible date.

(Ex. 34.)

20.     Plaintiff agrees that he signed the Loan Agreement on June 15, 2016.  (Tr. 36:22–37:1, 45:25–46:9.)

21.     On June 23, 2016, Plaintiff was transferred to Denver Reception Diagnostic Center.  (Tr. 24:1–2.)

**C.**    **July 6, 2016 Visit**

22.    On July 6, 2016, McClintock visited Plaintiff at Denver Reception Diagnostic Center.  (Tr. 30:6–8.)

23.    Plaintiff signed two additional MV POAs: one for a 2007 Haul-a-day trailer and one for a 1992 Harley Davidson motorcycle.  (Tr. 30:8–10, 299:2–4; Ex. 7 (2007 Haul-a-day trailer); Ex. 11 (1992 Harley Davidson motorcycle).)  The MV POAs that Plaintiff signed state: "The purpose of this Power of Attorney is to give the person you designate (your agent) powers to handle your property and affairs, which may include power to pledge, sell, or otherwise dispose of the motor vehicle described below without any advance notice to you."  (Exs. 7, 11.)  Additionally the selections Plaintiff checked off on the MV POA concerning the Harley Davidson allow Defendant "[t]o transfer ownership and acknowledge odometer reading."  (Ex. 11.)  The selections Plaintiff made concerning the hauler allow Defendant to "Apply for and Receive Certificate of Title" and "To transfer ownership and acknowledge odometer reading."  (Ex. 7.)

24.    The two aforementioned MV POAs were signed "Daniel R. Goodwin." (Ex. 7; Ex. 11.)  Plaintiff acknowledged that his signature is blocked out on the MV POA for the hauler.  (Tr. 61:1–4.)

25.    Plaintiff also signed two blank MV POAs on July 6, 2016, which were intended to represent the 1998 Monaco and the 1969 Corvette.  (Tr. 27:12–22; Ex. 6.)

26.    On July 6, 2016, Plaintiff signed a general power of attorney ("POA") designating Defendant as his agent and giving her full statutory power of attorney.  (Tr. 57: 3–59:7; Ex. 4.)

27.    During this visit, Plaintiff also gave power of attorney to Defendant to manage his Wells Fargo personal checking and savings accounts.  (Tr. 27:2–8.)

28.     Defendant received the notarized documents signed by Plaintiff on July 6, 2016 from Plaintiff's lawyers.  (Tr. 111:21–112:25, 154:16–23.)

**D.     Defendant's Loans and Expenses**

29.     As Plaintiff's agent, Defendant performed numerous tasks on Plaintiff's behalf, such as doing general business, paying his bills, and managing his bank accounts and bank fees.  (Tr. 107:17–108:12.)  Defendant anticipated that Plaintiff would repay the money she had loaned to him based on his numerous promises.  (Tr. 108:13–19.)

30.     Later, Defendant incurred other expenses on Plaintiff's behalf, including faxing, mailing, dealing with her own lawyer and his staff in connection with this lawsuit, purchasing Plaintiff's will, visiting Plaintiff in jail, and replacing tires that were damaged on the way to visit Plaintiff.  (Tr. 134:20–135:13.)

31.     In her affidavit, Defendant states that she loaned Plaintiff additional funds for phone, commissary, and holiday packages through 2017 on his promise that she would be repaid.[3]  (Ex. A13 ¶ 13.)

32.     Defendant testified that she has loaned Plaintiff a total of $48,570.12.  (Tr. 134:13–16.)  Additionally, Defendant testified that the expenses she has incurred on

_____

[3] In her Amended Findings of Fact and Conclusions of Law, Defendant refers to this verbal agreement that Plaintiff would repay Defendant for his expenses from his NEAP account when the funds became available to him as the "Ongoing Loan Agreement."  (ECF No. 175 at 8.)

Plaintiff did not file an answer to the counterclaims in this case.  The Court notes that Plaintiff did not raise an affirmative defense of statute of frauds, and therefore, that defense is waived.  *See Univex Int'l, Inc. v. Orix Credit All., Inc.*, 902 P.2d 877, 879 (Colo. App. 1995), *aff'd*, 914 P.2d 1355 (Colo. 1996) (statute of frauds is an affirmative defense that ordinarily must be raised by answer and if not, will be deemed waived on appeal).

Plaintiff's behalf and in connection with this lawsuit total $185,544.48.  (Tr. 135:14–21.)

She testified that she has hundreds of receipts.  (Tr. 134:14–16.)

33.     With respect to additional expenses incurred on her own behalf,

Defendant testified that she has incurred roughly $90,000 in attorney's fees, excluding

this trial, in connection with this lawsuit.  (Tr. 135:22–136:1.)

34.     On October 6, 2016, NEAP's Pension Services Department sent Plaintiff a

letter notifying him that he was 100% vested in the Plan and that the current balance

was $457,776.60.  (Ex. 45.)  However, Defendant's affidavit states that Plaintiff did not

tell her that he could withdraw funds from his NEAP account; instead, he continued to

borrow money from her rather than use his NEAP funds.  (Ex. A13 ¶¶ 12–14.)

**E.     Defendant Requests Repayment from Plaintiff**

35.     On December 29, 2017, Defendant explained to Plaintiff that she needed

some of her money back because she was having health issues and would face a

considerable amount of healthcare bills.  (Tr. 113:16–21.)

36.     According to Defendant, Plaintiff responded that he would not repay the

loan until McClintock won his appeal.  (Tr. 113:10–25.)  Plaintiff does not recall saying

as much.  (Tr. 54:16–19.)  Plaintiff also testified that he could not repay Defendant

because she closed his bank accounts.  (Tr. 35:20–36:2, 37:22–9, 39:2–3.)  However,

at trial, Plaintiff admitted that he directed Defendant to close his accounts, including his

Wells Fargo account.  (Tr. 55:19–24, 56:7–11.)  He also acknowledged that he still had

a Bank of America account that Defendant had not closed.  (Tr. 73:23–24.)

37.     As a result of the foregoing, Defendant thought that she had been "had"

and needed to "protect [herself] financially."  (Tr. 114:1–6.)

38.     On February 21, 2018, Defendant terminated her general power of

attorney for Plaintiff.[4]  (Tr. 78:2–5.)  Defendant notified Plaintiff of the termination in a letter, to which Plaintiff did not respond.  (Tr. 78:6–9.)

39.     On June 21, 2018, Defendant sent Plaintiff a letter requesting that he repay $57,718.39 no later than July 16, 2018.  (Ex. 32.)

40.     On July 20, 2018, Defendant sent Plaintiff a letter explaining that she had not received the requested payment and that Plaintiff had ten days in which to remove any item within her possession that he wished to retain.  (Ex. 33.)

41.     Plaintiff did not repay Defendant's loan.  (Tr. 73:23–25, 91:3–5.)

**F.     Sale of Vehicles**

42.     The vehicles Plaintiff used as collateral for the Loan Agreement were in "very poor" condition, according to Defendant's expert witness, Porter Richardson.  (Tr. 181:11–188; Ex. A (Richardson's expert report).)

43.     Defendant sold the motor coach at auction on April 11, 2019 for $10,000. (Tr. 40:4–7, 122:9–14; Ex. A13.)

44.     On March 23, 2020, pursuant to the Package Vehicle Sales Contract, Defendant sold the Bronco, the Harley Davidson, the hauler, the Corvette, and the boat to Alanna Woodard for $4,700.  (Tr. 48:2–16; Ex. A90.)

45.     Plaintiff admitted that he had no evidentiary support for his claim that the vehicles were worth $545,500, other than he thought they were worth more "to [him]."

---

[4] The record is unclear with respect to the exact date on which Defendant terminated her general power of attorney.  The exhibit upon which Defendant's counsel relied to elicit this testimony, Exhibit F, was not admitted as a trial exhibit.  Exhibit F is a letter dated May 23, 2018, which indicates that Defendant has not had general power of attorney for Plaintiff since approximately February 1, 2018.  Therefore, the Court finds that Defendant terminated her general power of attorney either on February 1 or 21, 2018.  This discrepancy does not affect the outcome of this litigation.

(Tr. 89:14–91:1.)

46.     Plaintiff conceded that he does "not have a claim stating that [Defendant] is not allowed to sell those vehicles with that contract [the Loan Agreement]."  (Tr. 90:18–91:1.)  Plaintiff stated that, he "was supposed to have until the age of 59 ½ to repay [Defendant], but it never stated that she was not allowed to sell those vehicles." (Tr. 91:10–15.)

## II. CONCLUSIONS OF LAW

### A.     Jurisdiction & Status of the Parties

47.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of Colorado, and Defendant is a citizen of New Mexico.  (ECF No. 1. at 3–4; ECF No. 3 at 1.)

48.     In his Complaint, Plaintiff alleged that his claim against Defendant was worth $545,500, which exceeds the statutory amount in controversy requirement.  (ECF No. 1 at 7.)

### B.     Applicable Law

1.     Parties' Claims

49.     Plaintiff asserts a breach of contract claim against Defendant, arguing that under the Loan Agreement, he was "supposed to have until the age of 59 ½ [approximately June 2022] to repay [Defendant]," but she sold his vehicles before he reached that age.  (ECF No. 1; Tr. 91:13–15.)

50.     In the Answer to Amended Complaint and Counterclaims ("Counterclaims"), Defendant asserts a breach of contract counterclaim against Plaintiff, arguing that he failed to repay her pursuant to the Loan Agreement and the Ongoing Loan Agreement.  (ECF No. 3 at 2.)

51.     Defendant also asserts a counterclaim of unjust enrichment against Plaintiff, alleging that she loaned Plaintiff over $70,000, which he promised to repay but did not.  (ECF No. 3 at 2.)

2.     <u>Choice of Law Analysis</u>[5]

52.     This case is before the Court pursuant to its diversity jurisdiction.  28 U.S.C. § 1332.  A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits.  *See Voodoo Leatherworks LLC v. Waste Connections US, Inc.*, 618 F. Supp. 3d 1126, 1133 (D. Colo. 2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Therefore, the Court applies Colorado choice of law principles to this case.

53.     "Colorado has adopted the Restatement (Second) of Conflict of Laws § 187 (1971) to determine the law applicable to a contract action."  *Id.* (citing *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 198 Colo. 444, 447 (1979) ("[W]e now adopt the Restatement (Second) [of Conflict of Laws] approach for contract actions."); *Target Corp. v. Prestige Maint. USA, Ltd.*, 351 P.3d 493, 497 (Colo. App. 2013)).  Consistent with the Restatement, Colorado courts "apply the law chosen by the parties unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." *Voodoo Leatherworks*, 618 F. Supp. 3d at 1133 (quoting *Target Corp.*, 351 P.3d at 497).

54.     Here, the contracts at issue, the Loan Agreement and the Ongoing Loan

---

[5] Neither party analyzed what law applies in this case in their post-trial findings of fact and conclusions of law.  (ECF Nos. 175, 188.)

Agreement, have no choice of law provision.  (Ex. 34.)

55.     For contract claims, the Court must apply the law of the state with the most significant relationship to the contract.  *See Wood Bros*., 198 Colo. at 447–48.  To determine which state has the most significant relationship, the Court must take into account the principles set forth in both Section 6 and Section 188 of the Restatement (Second).  *See Wood Bros*., 198 Colo. at 447–48.

56.     Section 6 of the Restatement states that when there is no statutory directive of what state's law applies, the factors relevant to the choice of the law analysis include:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Wood Bros*., 198 Colo. at 447 (quoting § 6 of the Restatement (Second)).

57.     Under Section 188, if the parties have not agreed to an effective choice of law by contract, the contacts to consider include: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the party.  *See id*. (citing Restatement 2nd §

188(2)).

58.     The Court has considered the factors explained in *Wood Brothers* and, for the following reasons, determines that Colorado has the most significant relationship to this action, and therefore applies Colorado law.  The Loan Agreement was signed in Colorado, where Plaintiff is incarcerated, though it is not clear where it was negotiated. As the finder of fact, the Court draws a logical inference that the Ongoing Loan Agreement, too, was a Colorado contract.  As Plaintiff is incarcerated in Colorado, he presumably would have repaid Defendant from Colorado.  At least some of the vehicles were stored at the home of Plaintiff's aunt, Mabel McCandless, in Pueblo, Colorado. (Tr. 128:2–3.)  Plaintiff is a Colorado citizen and chose to bring his case here.

59.     In her Amended Final Findings of Fact and Conclusions of Law, Defendant cites Colorado law without analyzing choice of law principles in the context of a loan contract.  (*See* ECF No. 175.)

60.     Neither party has argued that there is no reasonable basis for applying Colorado law or that applying Colorado law would be contrary to the fundamental policy of Colorado.  (*See* ECF Nos. 175, 188.)  Moreover, Defendant has applied Colorado law to the dispute.  (*See* ECF No. 175.)  Plaintiff cites a variety of state and federal case law, seemingly without considering what law applies.  (*See* ECF No. 188.)

61.     Therefore, the Court, sitting in diversity, applies Colorado law to this dispute.

3.     <u>Breach of Contract</u>

62.     Under Colorado law, to prove a breach of contract claim, a plaintiff must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant;

and (4) resulting damages to the plaintiff.  *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008) (citing *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).

63.     "The amount of damages awarded for a breach of contract cannot be based on speculation or conjecture; rather, it must be established with reasonable certainty by a preponderance of the evidence."  *Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1231 (Colo. App. 2000) (citing *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378 (Colo. 1993)).  "If the amount of loss is not satisfactorily proved, a small sum fixed without regard to the actual amount of loss will be awarded as nominal damages."  *Id.* (citing *Gen. Ins. Co. v. City of Colorado Springs*, 638 P.2d 752 (Colo. 1981); *Doyle v. McBee*, 161 Colo. 130 (1966)).  "As fact finder, the trial court has the sole prerogative for fixing the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous."  *Id.* (citing *Kincaid v. Western Operating Co.*, 890 P.2d 249 (Colo. App. 1994)).

4.     Unjust Enrichment

64.     In Colorado, "a party claiming unjust enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."  *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008).

65.     An unjust enrichment claim is precluded by enforceable express contracts covering the same subject matter.  *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).

66.     "A party who has been unjustly enriched generally must make restitution to the other party by returning that party to the position it previously occupied."  *Id.*

(citing *Salzman v. Bachrach*, 996 P.2d 1263 (Colo. 2000) (quoting Restatement of Restitution § 3 (1937))).  "Unjust enrichment does not depend on the existence of an express or implied-in-fact contract."  *Id.* (citing *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093 (Colo. 1982)). "Instead, courts may imply a contract in law, often termed a quasi-contract, and allow recovery to serve the 'law of natural immutable justice and equity.'"  *Id.* (citing *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 119 (Colo. 1998)).

67.     "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."  *Id.* (citing *Printz Servs. Corp. v. Main Elec.*, Ltd., 949 P.2d 77 (Colo. App. 1997), *aff'd in part and rev'd in part*, 980 P.2d 522 (Colo. 1999); *Stanford v. Ronald H. Mayer Real Estate, Inc.*, 849 P.2d 921 (Colo. App. 1993)).

68.     "However, this principle recognizes two exceptions."  *Id.*  "First, a party can recover on a quasi-contract when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract."  *Id.* (citing *Scott Co. v. MK–Ferguson Co.*, 832 P.2d 1000 (Colo. App. 1991)).  "Second, a party can recover on a quasi-contract when the party 'will have no right under an enforceable contract.'"  *Id.* (citing *Backus v. Apishapa Land & Cattle Co.*, 44 Colo. App. 59, 62, 615 P.2d 42, 44 (1980)).  "For example, quasi-contractual recovery may be allowed when an express contract failed or was rescinded."  *Id.* (citing *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441 (Colo. 2000)).

69.     "Resolution of this issue presents a mixed question of law and fact."  *Id.*

"The existence of an express contract is a question of fact."  *Id.* (citing *Beach v. Beach*, 56 P.3d 1125 (Colo. App. 2002)).  "Application of the rule that an express contract supersedes a quasi-contract covering the same subject is a question of law."  *Id.* (citation omitted).

     5.    <u>Plaintiff's Other Theories</u>

         a.    *Intent*

70.    At trial, Plaintiff stated in his opening statement that he was bringing an intent claim.  (Tr. 236:22–25.)  He explained to the Court that the "intent is deception, misguidance, to deprive another permanently of anything of value under—under deception of [Defendant] supposedly being [his] guiding light and angel of confidence." (Tr. 237:1–4.)

71.    Plaintiff did not plead an intent claim in his Complaint, nor did he move to amend the pleadings during this litigation.  (ECF No. 1.)  *See* Fed. R. Civ. P. 15, 16.

72.    While it is unclear precisely what Plaintiff intends in orally bringing an "intent" claim, it appears as though this argument is merely another species of his breach of contract claim.  In other words, with his intent claim, Plaintiff alleges that Defendant prematurely sold his vehicles in violation of the Loan Agreement.

73.    Accordingly, the Court construes Plaintiff's intent claim as the same as his breach of contract claim and discusses Plaintiff's purported intent claim no further.

         b.    *Fraud*

74.    In Plaintiff's Proposed Finding[s] of Fact and Conclusion[s] of Law, he states that "Defendant committed fraud in the factum by compelling Plaintiff under duress and without informed consent, into an unconscionable contract against 'Full Disclosure' 'Good Faith' and 'Clean Hands' doctrines as applied to the Power of

Attorney. [pseudo-Power of Attorney]."  (ECF No. 188 at 16.)

75.     Plaintiff did not plead a fraud claim in his Complaint, nor did he move to amend the pleadings during the litigation.  (ECF No. 1.)  *See* Fed. R. Civ. P. 15, 16.

76.     Further, even if Plaintiff had pled a fraud claim, which he did not, the Court concludes that Plaintiff failed to set forth any evidence to support a fraud claim at trial. Therefore, the Court discusses Plaintiff's purported fraud claim no further.

      6.    <u>Colorado Attorney Fees Statute for Frivolous Actions</u>

77.     Colorado law provides that "in any civil action of any nature commenced or appealed in any court of record in this state, the court may award, except as this article otherwise provides, as part of its judgment and in addition to any costs otherwise assessed, reasonable attorney fees."  Colo. Rev. Stat. § 13-17-102(1).

78.     Further, "[t]he court shall assess attorney fees if, upon the motion of any party or the court itself, it finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification or that the action, or any part thereof, was interposed for delay or harassment or if it finds that an attorney or party unnecessarily expanded the proceeding by other improper conduct, including, but not limited to, abuses of discovery procedures available under the Colorado rules of civil procedure or a designation by a defending party under section 13-21-111.5(3) that lacked substantial justification.  As used in this article, 'lacked substantial justification' means substantially frivolous, substantially groundless, or substantially vexatious." Colo. Rev. Stat. § 13-17-102(4).

79.     Additionally, "[n]o party who is appearing without an attorney shall be assessed attorney fees unless the court finds that the party clearly knew or reasonably should have known that his action or defense, or any part thereof, was substantially

frivolous, substantially groundless, or substantially vexatious[.]"  Colo. Rev. Stat. § 13-17-102(6).

C.      **Plaintiff's Breach of Contract Claim**

80.     The parties do not dispute the existence of a valid contract, and therefore, the Court addresses the breach of contract elements concerning the parties' performance under the Loan Agreement.  (Ex. 34.)

81.     Pursuant to the Loan Agreement, Defendant performed her obligation and gave Plaintiff the $35,000 loan for his legal fees, and as surety, Plaintiff transferred his six vehicles to Defendant by executing the MV POAs.  (Ex. 7, 11, 14, 17, 21, 25, 34.)

82.     Plaintiff's theory of breach of contract is that Defendant breached the Loan Agreement by selling his vehicles before his 59 ½ birthday.

83.     After Plaintiff expressed his intent not to repay the Loan Agreement when Defendant told him she needed some of the money back to pay for medical expenses, Defendant called in the loan.  The Loan Agreement contains no provisions restricting Defendant from calling in the loan at any time.  (Ex. 34.)  Additionally, the Loan Agreement contains no provisions prohibiting Defendant from selling the vehicles until Plaintiff's 59 ½ birthday.  Rather, the Loan Agreement states that Plaintiff has until his 59 ½ birthday to pay Defendant; the provision constrains Plaintiff, not Defendant.

84.     Plaintiff admitted at trial that he did not repay Defendant by July 16, 2018, and, at least as of the date of these Findings of Fact and Conclusions of Law, has not repaid Defendant the $35,000 loan.  (Tr. 73:23–25, 91:3–5.)

85.     Plaintiff admitted at trial that the Loan Agreement contains no provisions that would have barred Defendant from selling his six vehicles for the maximum amount she testified she could obtain: $14,700.  (Tr. 90:18–91:15.)  Plaintiff further testified that

under the Loan Agreement, he "was supposed to have until the age of 59 ½ to repay [Defendant], but it never stated that she was not allowed to sell those vehicles."  (Tr. 91:10–15.)

86.    The Court disagrees with Defendant's argument that the general POA also gave Defendant the right to sell the vehicles.  (ECF No. 175 at 13, 16 ("General POA: Under the General POA she had the right to transfer all of the vehicles into her name and was 'able to make decisions and act with respect to [Defendant's] property.'").) Defendant terminated her general POA before she sold the vehicles, and in doing so, terminated her authority to sell the vehicles pursuant to her general POA.  Nevertheless, the evidence shows that she still had the authority to sell the vehicles pursuant to the MV POAs and the Loan Agreement.

87.    Given the foregoing, the Court concludes that Defendant did not fail to perform nor did she breach the Loan Agreement.

88.    As a result, Plaintiff suffered no damages in connection with his claim for breach of the Loan Agreement.

**D.    Defendant's Counterclaims**

1.    <u>Liability</u>

a.    *Breach of Contract*

(i)    Loan Agreement

89.    The Court's analysis with respect to Plaintiff's breach of contract claim also applies to Defendant's claim that Plaintiff breached the Loan Agreement by failing to repay the $35,000 by the deadline of July 16, 2018.  (Ex. 33.)  The Court incorporates that analysis, Part II.C, herein.

90.    Plaintiff admitted at trial that he did not repay Defendant by July 16, 2018,

and, at least as of the dates of the trial in this action, has not repaid Defendant the $35,000 loan.[6]  (Tr. 73:23–25, 91:3–5.)  Plaintiff's failure to repay the loan constitutes failure to perform the contract under Colorado law.

91.    The Court concludes that Plaintiff breached the Loan Agreement by failing to pay Defendant $35,000 by July 16, 2018.

(ii)    Ongoing Loan Agreement

92.    The Court concludes that the parties entered into a valid verbal contract, referred to as the Ongoing Loan Agreement, whereby Defendant agreed to loan Plaintiff additional money in exchange for Plaintiff's promise to repay her from his NEAP account, which contained at least $400,000.  (Ex. 45; Ex. A18.)

93.    As further evidence supporting the existence of the Ongoing Loan Agreement, Plaintiff's will explicitly states his promise to repay Defendant in full all legal expenses, travel expenses, and all phone and canteen money from his NEAP account. (Ex. A18.)

94.    Pursuant to the Ongoing Loan Agreement, Defendant states that she has loaned Plaintiff thousands of dollars in excess of the $35,000 set forth in the Loan Agreement.  (Tr. 135:17–21.)

95.    The Court concludes that Plaintiff has not repaid Defendant, thereby breaching the Ongoing Loan Agreement.

96.    As a result of Plaintiff's failure to perform the contract, Defendant has incurred damages.

---

[6] As of the date of the Court's Findings of Fact and Conclusions of Law set forth herein, no party has informed the Court that Plaintiff has repaid Defendant.

b.    *Unjust Enrichment*

97.    Because the Court concludes that the Ongoing Loan Agreement exists as a matter of law and covers the same subject matter as her unjust enrichment claim, Defendant's counterclaim for unjust enrichment fails.  *See Interbank*, 77 P.3d at 819 ("an express contract precludes a quasi-contract on the same subject").

2.    <u>Damages</u>

a.    *Loan Agreement*

98.    Defendant incurred $35,000 worth of damages due to Plaintiff's breach of the Loan Agreement.

99.    However, because Defendant sold the vehicles, which were collateral for the loan, the Court finds that Plaintiff is entitled to a setoff of $14,700.

100.    Accordingly, Defendant is entitled to $20,300 in damages under the Loan Agreement.

b.    *Ongoing Loan Agreement*

101.    The Court concluded above that Defendant has incurred some amount of damages as a result of Plaintiff's failure to repay her under the Ongoing Loan Agreement.

102.    However, for the following reasons, the Court concludes that Defendant has failed as a matter of law to establish her damages "with reasonable certainty by a preponderance of the evidence."  *Interbank*, 12 P.3d at 1231.

103.    At various points in this litigation, Defendant has claimed that Plaintiff owes her tens of thousands—and sometimes over one hundred thousand—of dollars worth of damages.  In the Counterclaims, she alleges that Plaintiff failed to repay her over $70,000.  (ECF No. 3 at 2.)  At trial, Defendant testified that she has loaned

Plaintiff a total of $48,570.12.  (Tr. 134:13–16.)  In her June 21, 2018 letter to Plaintiff demanding payment, Defendant stated that Plaintiff owed her $57,718.39.  (Ex. 32.)  In that letter, Defendant provided a "breakdown of the debt owed: legal expenses $40,562.50, phone/commissary $4[,]851.51, miscellaneous $1[,]905.14, postage $169.16 so far, travel expenses $6[,]275.00 plus that set of tires I mentioned above, recovery expenses to date (these could go higher depending on your decision) $3[,]307.08 plus the postage to send this letter to two addresses certified mail with return receipt.  I have receipts for every bit of this.  I do not attempt to take advantage of anyone!"  (Ex. 32 at 2.)   Additionally, Defendant testified at trial that the expenses she has incurred on Plaintiff's behalf and in connection with this lawsuit total $185,544.48.  (Tr. 135:14–21.)  She testified that she has hundreds of receipts.  (Tr. 134:14–16.)

104.    However, despite these numerous statements that Plaintiff owes her these large sums, Defendant did not introduce evidence to support these damages values at trial or in connection with her Amended Findings of Fact and Conclusions of Law, as the Court explicitly directed.  (ECF No. 175; Tr. 138:17–23.)

105.    While the following trial transcript excerpts are lengthy, the Court deems quoting these questions and answers verbatim necessary to substantiate its damages conclusions.

Q:      (By Mr. Hilbert[7])  So I think we've gotten everything in there we need to, but I wanted to go over with you how much money did you loan Mr. Goodwin totally?

A:      [(By Defendant)] Total? $48,570.12.

---

[7] Otto Hilbert is Defendant's attorney in this civil action.

Q:     Okay.  And what expenses have you incurred on his behalf and in this lawsuit?

A:     On his behalf?

Q:     What expenses have you incurred?

A:     I've had a lot of expenses, like faxing, mailing, dealing with you and Marisa.  I have spent many, many, many hours working in what you feel is equivalent to a paralegal almost.  I'm sure I'm slower than Marisa, but—

Q:     And what kind of expenses did you incur on Mr. Goodwin's behalf when you were working for him?

A:     Well, I purchased—he asked—he called and asked specifically for forms for a living will and a will, et cetera.  Twice those had to be purchased.  I think each time it ran around 24 bucks, something like that.  Apparently the first set didn't make it up to CDOC [Colorado Department of Corrections] with him when I took them to him at—at Pueblo.  Lots of trips to visit him.  And they don't give fuel away these days, as I'm pretty sure we all know.

On this last trip for the pretrial conference, I managed to find some wonderful road trash on the way home and had to replace tires.  I have an all-wheel drive vehicle, so it meant four tires, because I—the traffic was heavy and I couldn't avoid hitting it.

Q:     Do you have—is it fair to say you have hundreds of receipts that relate to Mr.—

A:     Oh, definitely.  Definitely.

Q:     And you're comfortable that your expenses are what number?  Have you added them up?  Have you totaled them up?

A:      I have added them up, and I'm pretty comfortable—I'm very comfortable actually, about what I came up with the number.  $185,500—excuse me, $185,544.48.

Q:      Okay.  And then you've also obviously incurred attorney's fees.

A:      Roughly [$]90,000 to date.

Q:      Okay.

A:      That does not include this proceeding.

Q:      Okay.

Q:      [(By the Court)]: Mr. Hilbert, do we have some kind of accounting or some exhibit that—

Mr. Hilbert:    We have—

The Court:      —itemizes the $185,000 in alleged costs?

Mr. Hilbert:    Yes, Your Honor.  We have prepared affidavits for Ms. Chambers, Ms. Bryce, and myself with all the receipts.  We've got—and we've disclosed them all.  They've been disclosed in this lawsuit.

The Court:      All right.  But, I mean, do we—is any of that going to be put into evidence in this trial to corroborate the testimony, this pretty summary testimony of $185,000 in costs?

Mr. Hilbert:    My intention was to file a motion for attorney's fees and costs and have affidavits of Ms. Chambers with all of her receipts, affidavit from me with my billing, affidavit for Ms. Bryce with her billing.  So—but all of those—all of those documents have been disclosed.

The Court:      All right.  So just let me get this straight.  So it's your belief and understanding that the [$]185,000 in costs that you claim your client incurred are all

attributable to litigation-related costs that are recoverable under Rule 54, and the fees as well.  Is that—is that right?

What I'm driving at is are the costs an element of the damages of your claim so that it—you're—you're trying to establish these costs as part of the damages you're seeking to have included in a judgment on a counterclaim against the plaintiff or—and/or, maybe it's both, are they what normally or typically would be pursued by way of litigation costs and attorney's fees in a subsequent motion and subsequent briefing?

Mr. Hilbert:    Both.  It was my anticipation that I'd file a motion, but I did want her testimony as to what she's expended.  And the costs, to answer your question, are direct costs, a lot of them, for driving to see Mr. Goodwin, staying at a hotel, you know, prepare her car, whatever.  She's got thousands of receipts.

The Court:    Okay.  But—

Mr. Hilbert:    And then, in addition, there's paralegal fees.  I told Ms. Chambers at some point when she was doing essentially paralegal work, putting all these receipts together and so forth, and putting documents together for us, to keep track of her time; and she did.  So her affidavit would also include her time at $150 an hour.  And she, out of the goodness of her heart, gave a 20 percent discount on that.

So the answer to your question is both.  I intend to file the motion, but I just wanted her to testify as to what she's expended and what she would be entitled to as a matter for counterclaim.

The Court:    *All right.  So, you know, I mean.  This is an important point.  Again, I wanted to have you distinguish between costs as a species of damages that you're seeking on your counterclaim that if they were—or to the extent and if they were*

*awarded would be encompassed and included in the judgment, and distinguish costs that are damages as opposed to costs that are incurred in defending against what you believe is a meritless claim.*

Mr. Hilbert:    It's impossible to bifurcate the two.  In other words, under 52(c), those costs are expended because we've been forced, as has this Court, to tolerate this case for years, and all the expenses involved in it.  But, in addition, the costs that Ms. Chambers has incurred directly as a result of the agreement, the exhibit, and her unjust enrichment claim should be awarded as damages, straight-up damages, in her counterclaim.

The Court:    All right.  *So what's going to be important when you file your final set of proposed findings and conclusions is that you make that very clear and itemize all those categories of damages and costs very clearly so that I'm clear what it is you're asking for.*

Mr. Hilbert:    *Thank you Your Honor.  I will do that.*

The Court:    All right.  Okay.

Mr. Hilbert:    And that's all I have.

(Tr. 134:13–138:25 (emphasis added).)

106.    The Court has reviewed the exhibits admitted at trial and, as the foregoing questions and answers would suggest, cannot find receipts or other evidence substantiating Defendant's claimed damages by a preponderance of the evidence.

107.    In her Amended Findings of Fact and Conclusions of Law, Defendant does not even assert a total amount of damages claimed under the Ongoing Loan Agreement.  (ECF No. 175 at 13–14.)  Nor does she attach any exhibits supporting her

claimed damages to her Amended Findings of Fact and Conclusions of Law.  Instead, she merely cited the trial exhibits and testimony.

108.    The Court does not give credence to Mr. Hilbert's statements at trial that Defendant has previously disclosed the supporting documents in this litigation or that it is "impossible to bifurcate" damages incurred in connection with the Ongoing Loan Agreement from the fees and costs Defendant has incurred in connection with this civil action itself.  Not only does the Court conclude that it is not impossible, but Defendant's counsel appears not even to have attempted to do so.

109.    Additionally, while Defendant's counsel stated that he intended to file Defendant's damages evidence in connection with a motion, the Court specifically responded that he must do so in connection with Defendant's proposed post-trial findings of fact and conclusions of law.[8]  Defendant's counsel did not follow the Court's instructions.

110.    Further, the Court sees in Defendant's Amended Findings of Fact and Conclusions of Law that she states that she "shall submit an affidavit of fees and costs within two weeks of this Order, and Judge Varholak shall hold a fairness hearing as to the amount to be awarded."  (ECF No. 175 at 18.)  However, this is not what the Court explicitly directed Defendant to do; rather, the Court directed Defendant as follows:  "So what's going to be important when you file your final set of proposed findings and conclusions is that you make that very clear and itemize all those categories of damages and costs very clearly so that I'm clear what it is you're asking for."  (Tr.

---

[8] This is in addition to the fact that Defendant's counsel should have introduced such evidence at trial but did not do so.

138:17–21.)  Defendant's counsel said: "I will do that."  (Tr. 138:22–23.)  But he did not.

111.    Given Defendant's failure to provide evidence supporting her damages incurred as a result of the breach of the Ongoing Loan Agreement, the Court concludes that Defendant has not established her damages with reasonable certainty by a preponderance of the evidence.  *See Interbank*, 12 P.3d at 1231.  Therefore, because "the amount of loss [has not been] satisfactorily proved, a small sum fixed without regard to the actual amount of loss will be awarded as nominal damages."  *Id.*

112.    Therefore, the Court awards Defendant nominal damages in the amount of $100.00 in connection with Plaintiff's breach of the Ongoing Loan Agreement.

3.    Attorney's Fees and Costs

113.    In Defendant's Amended Findings of Fact and Conclusions of Law, she asserts that because Plaintiff's claims are "groundless and frivolous and without basis in fact or law," the Court should award her attorney's fees.  (ECF No. 175 at 14–18.)

114.    For the following reasons, the Court agrees with Defendant.

115.    Plaintiff testified that he does not "have a claim stating that [Defendant] is not allowed to sell those vehicles with that contract."  (Tr. 90:18–91:1.)  Moreover, he conceded that "[u]nder the loan agreement, [he] was supposed to have until the age of 59 ½ to repay [Defendant], *but it never stated that she was not allowed to sell those vehicles*."  (Tr. 91:10–15 (emphasis added).)

116.    Additionally, Plaintiff conceded at trial that he had no evidentiary support for his contention that his vehicles were worth $545,500, as alleged in his Complaint. (ECF No. 1.)  (Tr. 89:14–91:1.)

117.    Plaintiff's testimony is tantamount to a concession that he never had a good faith basis to bring a breach of contract claim against Defendant for selling his

vehicles before his 59 ½ birthday.

118.    Accordingly, the Court finds that Plaintiff, despite proceeding *pro se*, "clearly knew or reasonably should have known that his action or defense, or any part thereof, was substantially frivolous, substantially groundless, or substantially vexatious." Colo. Rev. Stat. § 13-17-102(6).

119.    The Court finds that Plaintiff admitted at trial that in fact, he had no breach of contract claim, and accordingly, the Court finds that his claim is frivolous as set forth in § 13-17-102(4).

### III. RULE 52(C) MOTIONS

Federal Rule of Civil Procedure 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party."  Fed. R. Civ. P. 52(c). Judgment under Rule 52(c) must be supported by findings of fact and conclusions of law as required by Rule 52(a).  *Id.*

At the close of the Plaintiff's case, Defendant made an oral motion pursuant to Rule 52(c) ("Rule 52(c) Motion").  (Tr. 95:2–4.)  The Court took Defendant's Rule 52(c) Motion under advisement.  (Tr. 103:17–20.)  Defendant renewed her Rule 52(c) Motion. (Tr. 240:6–10.)  At the end of the trial, Plaintiff also made a motion for dismissal of the counterclaims, which the Court construes as a Rule 52(c) motion ("Plaintiff's Rule 52(c) Motion").

The Court now rules on these oral motions: Defendant's Rule 52(c) Motion, and as renewed, and Plaintiff's Rule 52(c) Motion are denied as moot consistent with the foregoing findings of fact and conclusions of law entered after a full trial on the merits to

the Court.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.     Both parties' oral Rule 52(c) Motions are DENIED MOOT, as set forth above;

2.     The Court FINDS and CONCLUDES that Defendant Carol Smith-Chambers is entitled to judgment in her favor on Plaintiff Daniel Goodwin's breach of contract claim brought against her, as set forth above;

3.     The Court FINDS and CONCLUDES that Defendant Carol Smith-Chambers is entitled to judgment in her favor on her breach of contract claim with respect to the Loan Agreement against Plaintiff, as set forth above;

4.     The Court FINDS and CONCLUDES that Defendant Carol Smith-Chambers is entitled to judgment in her favor on her breach of contract claim with respect to the Ongoing Loan Agreement against Plaintiff, as set forth above;

5.     The Court FINDS and CONCLUDES that Defendant Carol Smith-Chambers's unjust enrichment claim is DISMISSED without prejudice;

6.     The Court ORDERS that, should Defendant wish to be awarded attorneys' fees and/or costs under Colo. Rev. Stat. § 13-17-102, she must file a motion, along with full supporting documentation, no later than **March 1, 2024**.[9]  Any response in

---

[9] The Court does not prejudge any motion filed in this or any litigation.  However, the Court is skeptical of Defendant's assertion at trial that she incurred $90,000 worth of legal expenses *before* trial occurred, particularly given that Defendant did not move to dismiss Plaintiff's claim or file a motion for summary judgment—both of which the Court fully anticipated her doing.  The Court cautions Defendant that her forthcoming motion for attorney's fees and costs cannot be used as a second bite at the apple to collect money that she would have been entitled to under her counterclaim for breach of the Ongoing Loan Agreement.

opposition to such a brief and supporting documentation shall be filed no later than

**March 22, 2024**.  Any reply in support of such a brief and supporting documentation

shall be filed no later than **April 5, 2024**;

      7.    The Clerk shall enter judgment in favor of Defendant and against Plaintiff

in the amount of **$20,400**; and

      8.    The Clerk shall terminate this action.

Dated this 9th day of February, 2024.

BY THE COURT:

William J. Martínez
Senior United States District Judge